We decide the case on who has the most medals, it's over. Well, my client is seated out here in seated civilian wear because he's no longer on active duty. Oh, I see. So maybe he has more. He's got plenty. Yeah, maybe he has more. He's got plenty. All right. Good morning. May it please the Court. My name is Eric Seitz, and I am representing the petitioner appellant in this matter. As of February 2010, Dr. Sung had completed nearly five years of a five-year surgical residency. He'd successfully completed every rotation, including outside rotations that he performed at Queens Hospital and at Kaiser Hospital here in Honolulu. He had not a single reported bad outcome of any of the surgeries in which he participated. He had no complaints about anything that he had done from patients, staff, or colleagues. He passed all of his boards and his exams. He was chosen in the fifth year to be the chief resident, which is an honor according to people who are highly regarded in their residency program training. And then out of the blue, in February of 2010, charges were brought against him by two senior surgeons at Tripler, alleging that Dr. Sung had failed to perform some examination of a patient and then, when asked about it, had lied to them about what he had done or failed to do. And they were recommending, based largely upon the fact that they thought he'd been dishonest, that he should be dismissed from the program. So they petitioned to the Graduate Medical Education Committee to conduct a hearing and dismiss him. Dr. Sung opposed that action, and that was when I became first involved. And we went to the GMAC proceeding, and we had a contested evidentiary hearing at which a number of other doctors and, amazingly, a number of other residents testified. I'm just wondering, why are you giving us this long wind-up? Because he prevailed in that proceeding. Yes, he did, but the most important thing about the fact that he prevailed, two things. One, the GMAC on their own reached out and found that Dr. Sung was in a hostile environment. And secondly, that these senior surgeons, who were used to having their way, continued with their hostility. And that underlay the second proceeding. Now, one of the results of that other first proceeding was that it was recommended that Dr. Sung be allowed to complete his residency at some other location. But the Army's a very small community. He could not find another military residency program willing to accept him. Although there were civilian residency programs here in Honolulu, who would have gladly allowed him to complete the 25 or 30 surgeries. Is that in the record? You know, I looked for it. I don't believe it is in the record, although I know we orally presented that to the judge. Would you understand that you only give us facts that are in the record? I certainly do. So I'll let you withdraw that, but please direct yourself to the record. Sure. In any event, the second episode then occurred a couple of months later after the first GMAC proceeding. Dr. Sung was on probation. He successfully completed the probationary period. But then in August of 2010, he suffered a depressive episode. And that was brought on, one, because of the continuing tensions in the program where he was returned to work at Tripler, and two, and that is in the record, because his wife had recently accepted a job in Australia. He was going back and forth to see her, and the travel caused some physical problems which resulted in the depression. He was relieved of his clinical duties. No problem with that decision in order to obtain treatment, command directive treatment for his depressive disorder, which he did. However, during that period of time, these same surgeons who had gone after him the first time decided that they didn't want him to be back and to be allowed to complete the program. Mind you, 25 or 30 surgeries, which he just had to participate in and sign off of. And so they initiated the second GMAC proceeding. And if you look, I've cited in my brief the conclusions that were reached by the board for correctional military records here, summarizing the record here at page 10 of my brief. But basically what they said was that the available evidence indicates that the applicant was diagnosed as suffering from major recurrent depression that impaired his abilities to perform his duties. We agree with that. But then they went on and they said that because of that, they did not believe that he was qualified to continue and to graduate and to go on to serve as an Army surgeon. And that was a leap from the record, which is not based upon any evidence whatsoever. Indeed, the only evidence in the record from the two psychiatrists who testified was that he was responding well, he was eligible to return to his clinical responsibilities, and there was no reason those doctors thought that he couldn't perform in the field as an Army surgeon if allowed to complete the program. Now, there's been a question raised, and counsel and I have discussed this, about whether or not the case is moot at this point because of the fact that Dr. Sohn completed his obligation to the Army. He was deployed to Turkey, Korea, and Estonia as a medical officer, and he recently resigned his commission in May of this year after fulfilling his obligations, by the way, as a major. He was promoted. It's not moot because he still wants to be a surgeon, and he can't get into another surgical residency program with this mark of having been dismissed from his surgical residency, and he can't take the boards unless he finishes a surgical residency, and no hospital will give him surgical privileges. No insurance company will give him malpractice insurance. He can't work as a surgeon. Excuse me. I think you may be a little bit outside the record. You may be right, and I was concerned about what the status of his leaving the Army is going to end up in, and it's certainly an issue, and I can see his point. If he has this blemish on him, medical facilities are not forgiving on those things, but you're beginning to get into something that is not in the record. I suppose the issue before us is whether his leaving the Army moots this case. Yes. That's been raised by Mr. Helper, and I don't think there's any argument, any reasonable argument that it does. You've discussed this with your adversary. I take it your adversary may be taking an opposite position. He will express himself. I've told him he's certainly free to do so, and the letter that you received in the record was the product of a joint discussion that we had. I have no problem bringing this to the attention of the court, but I don't think it is an issue, and if it is an issue, then it ought to be remanded for determination so that we can expand the record or determine what, if any, impact this dismissal from the Tripler program may have on his career. Yeah, I see what you mean. What relief can we give so far as you're concerned? We don't decide who qualifies to be a surgeon. The record doesn't let us do it. Nothing lets us do it. So what relief can we give? Well, first of all, I think you can make a determination. We asked for injunctive or declaratory relief in the court below, and I think you can make a determination that this was not an academic decision. Everybody who raises and addresses that issue just basically clamps that on this whole procedure. What in this record would permit us to decide whether it was or was not? Because you cannot find any failure of this young man to perform an academic task. The only evidence of his inability to perform was his major depression. Now, I argue at length that there were procedures for the Army to follow if they thought that he was disabled. I don't argue that they should have followed those procedures, but what happened here was that they ignored the normal course for attempting to deal with somebody who is impaired, and they basically said this is an academic decision, and therefore it's unreviewable. And I would hope that this court would determine, based upon that record, that that is a wrong conclusion. There are no facts to support that conclusion, and therefore the case should be remanded for appropriate relief. And one form of that appropriate relief that could be taken would be to allow him to continue and finish his residency. Mind you, he only had to complete a certain number of surgeries because there's a numerical number that's required in order to be eligible for the boards. Can he do that having resigned? Can he do that? Yes, he can. There are any number of different ways that he could do that. But again, we could explore that with the district court. You know, when this case came up, of course, it goes into the mediation program. We begged the Army to mediate with us. We were not able to get anybody to agree. This is not a problem that was without a solution, and there are lots of other facts in terms of his service in the five years since this case first was brought up and the conditions of his service and his medical condition, all of which could contribute, I think, quite productively to obtaining a resolution of this case. But it can't be resolved in its present position because of the fact that the Army still maintains that he is unsuitable to serve as a surgeon, and that's the language that was adopted by the Board for Correction of Military Records. I think there was a little more than that, wasn't there? Under field conditions or something of the sort, wasn't there something, additional language? Well, that goes back and forth. Yes, basically the testimony upon which this record was provided was that he would not be able to function under the pressures of being deployed to a war zone. I'm not correcting you to correct you, but if you're going to argue effectively, then you have to talk to us about what we know is in the record. I understand, but that was completely speculative, and there was no medical evidence for that, and that testimony was given by surgeons, not psychiatrists. In fact, when one of the psychiatrists was asked, have you ever had any experience in the field, in deployment, with doctors who become depressed? I'm not suggesting we're going to decide it. You were arguing a point, and I wanted you to argue the point that is made in the record rather than the point that you think might carry the most weight. I appreciate that, but in any event, again, there's nothing in the record factually to support the conclusion, which is the linchpin for this case, that this was an academic decision. It was not. Let me ask you about the statement that appears in this. I think it's the September 2nd memo from Dr. Kellicott. Yes, Dr. Kellicott. Okay, so this is where he's being relieved of duty, and at the end he says, my obligation as a program director is to ensure that the resident has demonstrated sufficient competence to enter practice without direct supervision. Are you saying that that's not the relevant criterion? That's what I'm confused about, because it seems to me if that's what he needed to demonstrate, he most definitely did not, or at least we couldn't say that the decision-maker's decision here was arbitrary and capricious in saying that he hadn't. So are you saying that's just the wrong question to ask? No, that is an absolutely correct question, and I've seen that come up in many cases similar to this, where there are issues about competence to complete a residency program. But although that's the question, the answer to that question was that there was no evidence that he wasn't competent because he'd been doing it for five years until he became depressed. So the evidence of his need for supervision was based solely upon these couple of months where he'd been suffering from a depressive disorder. And by the time the case went before the GMAC, where the actual evidentiary record was comprised, there was no evidence that he needed any different or additional supervision than any other person who was at the end of his five-year residency. None. And that's why I say we have conclusory statements in answer to these issues, but no evidence. Had he bought the surgery? Had he failed to show up for a surgery? The reason this memo was drafted is that he failed to show up for that conference. I don't remember the name. Yes. What prompted the need for that conference? These were regular conferences about cases and about assignments and so forth. He failed to show up because he was sleeping 20 hours. Why he failed to show up? Why was the conference going to be discussed, I guess, at the conference? These were regular staff conferences for evaluation and planning purposes, and he, as the chief resident, was responsible for supervising all the other residents, and he didn't make it to that conference because he overslept. But, as I said, that has nothing to do with his competence as a surgeon. That's why I was asking why the conference was deemed so important. Was his conduct as a surgeon going to be the subject of that conference? No. Okay. That's what I was— Not that I'm aware of. Got it. His daily routines. So if there are no further questions, I'd like to reserve the rest of my time. Why don't you do that? We'll hear from the other side. Thank you. Good morning. May I please report to Tom Helper for the respondents, along with Major McGrath, the medal of Major McGrath at Council Table, just to respond to the court's most recent question. It was a morbidity and mortality conference, which there was testimony in the record that that is the most important kind of conference that they hold because it's discussing errors or potential errors made in the treatment of a patient. That's what the title of the conference suggests. That's why I asked the question. I was surprised to hear that, no, this is just sort of a routine thing that— So was there something specific that involved the conduct of the doctor that was— I believe that there is testimony to that effect that that was particularly important for him. I think there was a question and answer session with Dr. Kellicutt somewhere in the transcript. But to address the mootness issue, I learned of, just last week in preparing, that Dr. Sonnen left the Army, and with counsel's agreement, we drafted the letter and sent it in. I have to say my thinking has evolved a little bit on that. I really don't want this case to be moot. I want the case, the court, to reach a conclusion for everyone's sake. I think I'm obligated to bring it up as a possibility. Can I ask, just before you finish your remarks, can you just respond directly to your opponent's point? When I asked, you know, could—if the district court— let's say this case went forward and the district court granted relief, could he sort of be reinstated to finish the program in the Army, and he said, oh, sure. I am not aware of anything that would allow that. But if all he wants is a notation in his record to be changed, I mean, that happens in civilian context, you know, after people leave the Army. Well, are you—you said your thinking has evolved. Maybe you should finish your thought then. So I raise the issue if the court—I think there's a good argument to be made that it's not moot, because, you know, if you look at the ABCMR decision, what they decide, the issue they identify is whether his record should be corrected as opposed to whether he should be reinstated into the program. So I think that relief is probably available. Well, the issue isn't what you two agree to. It's whether or not we have jurisdiction. So I think we're trying to find out now is this enough of an issue that we need to have briefing on it by the parties, and we're trying to find out a little bit about what is the nature of this issue, why it might be moot. Is there any difficulty at all from an organizational point of view that the Army could not change the record if it chose to do so after further consideration? If this court were to air or decide that the ABCMR aired in its determination, I would think that the order would just say—show that he was reinstated into the program or that he was continued in the program in good standing or something to that effect. And that would allow him, as your opponent mentioned, to then be able to go to other— I don't know. I don't know what the effect of that would be. So if we need more information, we'll ask the parties to brief it. But it's not something that we can set aside because it has to do with our jurisdiction. Absolutely. That's why we raised it. Dr. Sung really wants to concentrate on what happened with the GMAC, with the committee. But that's not really what's before the court. What's before the court is the ABCMR decision. And it's important because there really isn't a decision out of the GMAC. There's a hearing, there's a bunch of evidence, and there's a result, but there's no explanation as to what factors they considered, why people voted various ways or however they voted. So there's really nothing to review there. I think there's assertions in the brief that the GMAC considered this or wrongly considered that. You don't know if that ever made a difference. And we raised this as an issue of waiver of arguments in this court that there's an obligation to identify in this court what exactly the wrong decision was below. And by focusing pretty much exclusively on what happened at the GMAC and ignoring the decision of the ABCMR and the attendant advisory opinion from the Army Surgeon General, I think that counsel or that Dr. Sung has waived that issue. Let's say we disagree with you on the waiver. Okay. Why don't we focus on the merits? Sure. The assertion, what the court called the windup of events prior to September, there's nothing in the record about this, the two surgeons with animosity, certainly nothing in the hearing transcript or in the documents filed with, at any point in the process from September on, say anything about this conflict. What the record does show is that the Army took affirmative steps to separate Dr. Sung from the prior circumstances by making sure that he wasn't on call schedules with the individuals who he had conflicts with before, none of whom were ever named as far as I know. As a matter of fact, and I think doing a couple of other things. And Dr. Sung said on the record that he had no animosity toward Dr. Kellicutt or he didn't think Dr. Kellicutt had any animosity toward him. So the standard of review here, of course, is APA, but I think there's reasons for extra, maybe a little extra caution, some of which is recognized by the President. We have a, is this a military decision? And I think that there's case law indicating that military decisions may get a little more deference. This is an academic decision, and there's certainly a Supreme Court precedent suggesting that academic decisions are deserving of deference. And it's a medical decision on who's equipped to be a surgeon. So as we sort of add on all those factors in terms of the complexity of the case, I think that I'd ask the Court to tread with a special caution in reviewing the record. What's our standard of review? It's was the action arbitrary and capricious or contrary at all? So this is the same standard we use for administrative agencies? Yes. As regards to the waiver issue, I notice that in the record it shows that sometimes he had both of these alphabet-entitled organizations. He would make a slant and go for both of them. Why doesn't that cover, why doesn't that get him by the waiver issue? Well, let me just, it doesn't because he doesn't show or identify the error in the APCMR decision. For example, one of the errors he identifies is that, or alleged errors, is that the GMAC improperly considered deployment issues in determining whether or not he should be allowed to continue the program. There's no assertion that that error was replicated in later stages. As a matter of fact, the whole purpose of this process is to allow the ABCMR to correct potential errors below. So the assertion that the GMAC made the decision doesn't say anything. It may have made an error. It doesn't do anything. Does ABCMR have the right to overrule GMAC? Right, yes. Can it then make its own decision or does it have to refer it back? Well, it certainly has the ability, it has the power to correct an injustice or an error by revising the petitioner's records. So, yes, it would have jurisdiction to take action on its own, or the power to take action on its own. But our review, if I understand correctly, would be of ABCMR? Correct. That is the final decision, the final agency decision that is before the court. Can I ask you just a big picture question? Yes. I mean, as I understand the plaintiff's pitch here, it's basically that Dr. Sung was suffering from a temporary condition that interfered with his ability to perhaps do everything that he needed to do to complete this program successfully in this pretty narrow time frame, right? And so why wouldn't the right response be to say, hey, let's take a timeout. You perhaps could get treatment that would address your condition because you otherwise, I think one of the doctors said he otherwise has the capability. It's just that he's not on 100 percent of the time, which you obviously need to be to be deployed as a surgeon. Well, he admitted that. Right, no, exactly. He admitted that. So why wouldn't the right solution be to say, come back when you're ready? And when you are able to give 100 percent, not that you're sort of never going to be able to be a surgeon. That would certainly, they could have made that decision. That would have been in their discretion, but they also had broad discretion to decide otherwise. They discussed that exact issue at some length. And the psychiatrists here, I think it's important to recognize here that this decision is in fact an academic one. Can he continue in the program? The testimony of the treating psychiatrists was limited to his ability, his medical ability to continue in the program. As a matter of fact, I think Dr. Morris said, I don't even know what the standards are for a surgeon. So the question here is can he perform as a surgeon? The psychiatrists were unable to say that he would not suffer a relapse. As a matter of fact, they were completely unwilling to give any kind of a ballpark estimate as to the likelihood or the frequency of a relapse. And it was discussed at the hearing that one of the problems was that in the last episode of depression in March when he was on probation, he said, according to the record, Dr. Sung said, according to the record, that he would recognize the next time around and be able to head off any problems. And then he didn't. And so we had the episode in September. So I think there's ample evidence, more than substantial evidence, to support the conclusion that this gentleman can never become a surgeon. I mean, that's what I guess I'm focusing on. I mean, maybe the reason your opponent gave the long windup was to suggest that we can peg the causes for what triggered these episodes. Part of it maybe was sort of the fault of the workplace. It might have been other things. But I don't know. We don't normally think of that as being something that is just going to remain with you for the rest of your life and sorry, you are just disqualified from entering this particular profession forever. Well, that wasn't the decision. The decision was you can't continue in this program. We're not going to allow you, we're not going to put you in a position to deploy, to go to a busy training center where you're going to be under stress. And I think Dr. Sung, both in the September 2nd letter, as related by Dr. Kellycutt, and in the hearing said, well, maybe you can send me someplace that's less busy, you know, get up to speed later, and I think the Army quite reasonably decided that that's not an option. Okay. But so maybe I just don't understand how this program works. Is it set up such that at the point in time where he's in the very last year of residency, the question becomes are you ready right now to basically be deployed without supervision as a surgeon, and either you are able to demonstrate that in the moment right now and you go forward, or if you can't, for whatever reason, you're just not going to be able to finish? Well, I think the court, I'm sorry, the GMAC extended his probationary period on one occasion, and I would assume they could have extended it again. I don't know why they couldn't, so that would be within the choices, but I think that it's clear from the record that they decided, given the universe of facts available to them, and I think it's the transcript reflects a lot of sympathy for Dr. Keller-Kent, and a real struggling with the issue. I'm sorry, Dr. Sung, a real struggle to sort of wrestle with these issues and good faith, and they decided that, in fact, he should not be a surgeon, that he was perfectly capable of being a regular Army doctor but not a surgeon. How do you define the issue that's before us for this issue? Well, I mean, under the APAA, did the APCMR abuse of discretion? Is there substantial evidence to support that decision? I think there's far more than substantial evidence as set forth in the Surgeon General's letter summarizing the findings or the evidence. Counsel, in argument, inferred or implied or did something that this really came up because there was two doctors who were mad at his client, and I had not heard that before. Is there anything in the record that was before the district court on that issue? No. Well, I believe the allegation that there was a hostile work environment was raised on the first go-around, the March probation. I don't recall there being any argument that that hostility carried over explicitly into the September process, and certainly there's no evidence in the record below, either the transcript or in the filings with the APCMR, that that issue was raised, that there was some vindictiveness. I just wanted to be sure. Your time is up. Thank you very much for your argument. Counsel has a minute for rebuttal. Thank you. With regard to the last question, there was lots of evidence in the record because the person who brought the charges against my client the first time around was a Dr. Galliano. If you look at the transcript of the second proceeding, you will see Dr. Galliano was the chief witness in those proceedings along with Dr. Kellicott. And so we didn't ask the GMEC the first time around to find that there was a hostile environment. They did that on their own. That's a finding. It's not an allegation. And then the perpetrator of that hostile environment is the one… You mean there's a finding in the record that these two doctors created a hostile working environment? Absolutely. And where would I find that finding? You would find that in all of the pleadings in which we reference and also in the Board for Correction of Military Records record in which they reference the first GMEC which found a hostile environment. And how did the district judge handle that issue? It wasn't addressed. It was in the pleadings, but it wasn't addressed. Wasn't there a hearing before the district court? Just argument. No evidence. And did you argue the issue in the district court? At length. And what did the district court decide? The district court basically ignored that issue and said, as the Board for Correction of Military Records ultimately had said, that this was an academic decision and none of those other matters had any bearing on the ultimate conclusion, that this was an academic decision which the Board for Correction of Military Records was entitled to make without review based upon the records that had been compiled by the GMEC. That's the way in which the record comes to you. And before the district court, did you ask for a finding? Yes. And the district judge said what about your request for an actual finding? The district judge entered summary judgment basically saying that there was no dispute that this was an academic, as far as he was concerned, there were no issues of material fact bearing upon the characterization of this decision as an academic decision, and therefore the court had to give deference to that decision. Correct. Let me just, if I could, I want to respond one more time at least to your other question. Judge Wallace, regarding the meeting that occurred, I guess, I'm sorry, it was Judge Watford, the meeting that my client missed. Thank you. I am honored. You and I have been doing this for 40 years. I don't know whether you recall. In any event, the meeting that my client missed was not a meeting in which any of his faults or shortcomings were at issue. If there were issues about other cases, that is the kind of meeting he certainly should have attended, but there was never any implication that he failed in any of his physician responsibilities other than attending a meeting. But this wasn't, I mean, the response to his failure to show, though, suggests that it was a more important meeting than your characterization. Well, that was their response. I agree with you, but, again, I also concur with your remarks that were made to Mr. Halper that this is an incident that could have been handled and I believe should have been handled in a vastly different manner other than to dismiss him from the program. The last thing I wanted to say is that when he was dismissed from the program, he didn't have the option to go out and enroll in another residency program. He might have been able to do that, but he didn't have that option because he owed five years to the military, and so they immediately deployed him to Korea, which is basically as close to a war zone as you can get when you're up by the DMZ. And he was in a very tense situation there and in Turkey where he performed not as a surgeon but as a medical officer and performed in a very distinguished manner. So, in our view, this is very hypocritical. There's an enormous amount of dishonesty in this record, and it's a tragedy for this young man who actually performed for five years in an exemplary manner. We're going to have to decide this case on the record. Yes, but the record is there, Judge Barras. The record is there. I believe it is. This is going to have to be truly your last point. Yes, it is truly my last point. He was extended. His residency was extended because he'd been on probation and relieved of his clinical responsibilities in conjunction with the first GMAC proceeding. And it was during that extension period that the second episode occurred. Had he not been subjected to charges of which he was cleared, he would have graduated. Okay. Thank you very much, counsel. The case just argued will stand submitted.
judges: Wallace, Farris, Watford